# United States Court of Appeals
## For the First Circuit

No. 12-2326

CARLA GERICKE,

Plaintiff, Appellee,

v.

GREGORY C. BEGIN, WEARE POLICE CHIEF, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITIES; JAMES J. CARNEY, LIEUTENANT, WEARE POLICE
DEPARTMENT, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; JOSEPH
KELLEY, SERGEANT, WEARE POLICE DEPARTMENT, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITIES; BRANDON MONTPLAISIR, POLICE OFFICER, WEARE
POLICE DEPARTMENT, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,

Defendants, Appellants,

WEARE POLICE DEPARTMENT, TOWN OF WEARE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Thompson, Selya and Lipez,
Circuit Judges.

Charles P. Bauer, with whom Robert J. Dietel, Gallagher,
Callahan & Gartrell, P.C., Corey M. Belobrow, and Maggiotto &
Belobrow, PLLC were on brief, for appellants.
Seth J. Hipple, with whom Stephen T. Martin and The Law
Offices of Martin & Hipple, PLLC were on brief, for appellee.

May 23, 2014

**LIPEZ, Circuit Judge**. This case raises an important question about an individual's First Amendment right to film a traffic stop by a police officer. Carla Gericke attempted to film Sergeant Joseph Kelley as he was conducting a late-night traffic stop. Shortly thereafter, she was arrested and charged with several crimes, including a violation of New Hampshire's wiretapping statute. Gericke was not brought to trial. She subsequently sued the Town of Weare, its police department, and the officers who arrested and charged her, alleging in pertinent part that the wiretapping charge constituted retaliatory prosecution in violation of her First Amendment rights.

In this interlocutory appeal, the defendant-appellant police officers challenge the district court's order denying them qualified immunity on Gericke's First Amendment retaliatory prosecution claim. Based on Gericke's version of the facts, we conclude that she was exercising a clearly established First Amendment right when she attempted to film the traffic stop in the absence of a police order to stop filming or leave the area. We therefore affirm.

## I.

We have interlocutory appellate jurisdiction over a denial of summary judgment on qualified immunity grounds only if the material facts are undisputed and the issue on appeal is one of law. Mlodzinski v. Lewis, 648 F.3d 24, 27 (1st Cir. 2011). As the

-3-

officers acknowledge, we must accept and analyze Gericke's version of the facts. See Campos v. Van Ness, 711 F.3d 243, 245 (1st Cir. 2013). We offer for context, only where it is uncontested, Sergeant Kelley's account of events.

On March 24, 2010, at approximately 11:30 p.m. in Weare, Gericke and Tyler Hanslin were caravaning in two cars to Hanslin's house. Gericke was following Hanslin because she had never been to his house. Gericke had a passenger in her car, as did Hanslin.

On South Stark Highway, Sergeant Kelley pulled his police car behind Gericke's vehicle and activated his emergency lights. Believing that Kelley was pulling her over, Gericke stopped her car on the side of the highway. Hanslin likewise stopped his car in front of Gericke's. Kelley parked his own vehicle between Hanslin's and Gericke's cars. Kelley approached Gericke's car, informed her that it was Hanslin who was being detained, and told her to move her car. Gericke informed Kelley that she was going to pull her car into the adjacent Weare Middle School parking lot to wait for Hanslin. According to Gericke's deposition, Kelley "eventually said that's fine."

As Gericke was moving her car, Kelley approached Hanslin's vehicle. According to Kelley, when he asked Hanslin if

he had any weapons, Hanslin disclosed that he was carrying a firearm. Kelley instructed Hanslin to exit the car.[1]

Once Gericke parked in the lot, she got out of her car and approached a fence that, along with a grassy area, separated the lot from the road. Gericke was at least thirty feet from Kelley. Gericke announced to Kelley that she was going to audio-video record him. She pointed a video camera at Kelley and attempted to film him as he was interacting with Hanslin.

Unbeknownst to Kelley, Gericke's camera, despite her attempts, would not record.[2] Kelley ordered Gericke to return to her car, and she immediately complied. From her car, she continued to point her camera at Kelley even though she knew the camera was not recording. Significantly, under Gericke's account, Kelley never asked her to stop recording, and, once she pulled into the parking lot, he did not order her to leave the area.

Gericke stopped holding up the camera on her own accord and placed it in the center console of her car. Officer Brandon Montplaisir then arrived on the scene. Montplaisir approached

---

[1] Gericke states that Hanslin was properly licensed to possess and carry a pistol, and she asserts that at no point did Sergeant Kelley draw his own weapon.

[2] The parties do not treat as relevant the fact that Gericke attempted, but was unable, to record Kelley due to a problem with her video camera. We agree that Gericke's First Amendment right does not depend on whether her attempt to videotape was frustrated by a technical malfunction. There is no dispute that she took out the camera in order to record the traffic stop.

Gericke while she was in her car and demanded to know where her camera was, but she refused to tell him. He asked for her license and registration. When Gericke did not comply, Montplaisir arrested her for disobeying a police order. Lieutenant James Carney then arrived on the scene, as did several civilians in a car.[3] Gericke was transported to the Weare police station, where the police filed criminal complaints against her for disobeying a police officer, see N.H. Rev. Stat. Ann. § 265:4; obstructing a government official, see id. § 642:1; and, the charge relevant here -- unlawful interception of oral communications, see id § 570-A:2.[4] Gericke's camera was also seized.[5]

A criminal probable cause hearing was scheduled for May 25, 2010. On the day of that hearing, the town prosecutor declined

_____

[3] In her deposition, Gericke stated that she thought there were three people in the additional civilian car that arrived. She stated that she knew several of the occupants of the car, who she thinks arrived to "take a look and make sure everyone [was] safe."

[4] For the purpose of this interlocutory appeal, the parties do not make an issue of the identity of the officer(s) who charged Gericke with illegal wiretapping. Therefore, without specificity, we simply refer to the "police" or the "officers" in describing those who charged Gericke with illegal wiretapping.

[5] On November 2, 2010, the police obtained a warrant to search the contents of Gericke's video camera. According to the government, during the search of the video camera, digital video files were discovered but could not be opened. The camera was sent to the New Hampshire State Laboratory, which apparently encountered the same difficulty. Gericke subsequently filed a motion in state court seeking return of her video camera. The motion was granted, and her camera was returned after the government's motion for reconsideration was denied.

to proceed on the pending charges, including the charge for unlawful interception of oral communications. The prosecutor sent the matter to the Hillsborough County Attorney, who also did not move forward with the charges.[6]

In May 2011, Gericke brought this action under 42 U.S.C. § 1983 and state law against the defendant police officers, the Weare Police Department, and the Town of Weare. In her amended complaint, she alleged, inter alia, that the officers violated her First Amendment rights when they charged her with illegal wiretapping in retaliation for her videotaping of the traffic stop. In May 2012, the officers filed motions for summary judgment, arguing in pertinent part that they were entitled to qualified immunity on Gericke's First Amendment claim because there was no clearly established right to film the traffic stop.

In a thoughtful opinion, the district court ruled that the police lacked probable cause to believe that Gericke had committed illegal wiretapping because "that statute provides that, for a crime to occur, the victim of an intercepted oral communication must have had a reasonable expectation 'that such communication is not subject to interception under circumstances justifying such expectation.' [N.H. Rev. Stat. Ann. §] 570-A:1, II." Gericke v. Begin, No. 11-cv-231-SM, 2012 WL 4893218, at *6

---

[6] The officers do not attempt to explain why the prosecution did not proceed, and neither party points to any explanation in the record.

(D.N.H. Oct. 15, 2012). Here, the district court reasoned, "the officers had no reasonable expectation that their public communications during the traffic stop were not subject to interception." Id.

The district court denied the officers' motions seeking qualified immunity on the First Amendment retaliation claim stemming from the illegal wiretapping charge, ruling that development of the facts was necessary before it could determine whether the officers were entitled to qualified immunity. Relying on our decision in Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011), the district court stated that, under the "broad holding" there, "a reasonable officer should have known that a blanket prohibition on the recording of all traffic stops, no matter the circumstances, was not constitutionally permissible." Gericke, 2012 WL 4893218, at *7 n.4. The court noted that "the circumstances faced by the officers in this case were substantially different than those faced by the officers in Glik." Id. at *7. Whereas Glik filmed an arrest on the Boston Common, the district court recognized that here the officers faced a potentially dangerous late-night traffic stop involving a firearm, multiple vehicles, and multiple citizens, some of whom, according to Kelley, were confrontational.

However, the district court reasoned that Glik "recognized that it is clearly established in this circuit that police officers cannot, consistently with the Constitution,

-8-

prosecute citizens for violating wiretapping laws when they peacefully record a police officer performing his or her official duties in a public area." Id. at *6. By extension, the district court concluded that there was not a clearly established First Amendment right to record in a disruptive manner the public activity of police officers. Because the court held that there was a genuine factual dispute about whether Gericke had been disruptive, the court denied the officers' motions for summary judgment on the retaliatory prosecution claim stemming from the wiretapping charge.

The officers filed this timely interlocutory appeal. If the district court was correct that the qualified immunity question depends on the resolution of disputed issues of fact about whether Gericke had been disruptive, we would refuse to hear this interlocutory appeal. See Mlodzinski, 648 F.3d at 27-28. However, since the officers "accept [Gericke's] version in order to test the immunity issue," we, in turn, accept interlocutory jurisdiction to decide the question on Gericke's "best case," which portrays compliance with all police orders. See id. at 28

The issue before us is whether it was clearly established that Gericke was exercising a First Amendment right when she attempted to film Sergeant Kelley during the traffic stop. If she was not exercising a First Amendment right, or, on her facts, a reasonable officer could have concluded that she was not, then the

officers are entitled to qualified immunity.  Our review is limited to the denial of summary judgment on qualified immunity grounds, Boyle v. Burke, 925 F.2d 497, 499 (1st Cir. 1991), which we review de novo, Mlodzinski, 648 F.3d at 32.

## II.

Qualified immunity provides government officials with "breathing room to make reasonable but mistaken judgments" by shielding officials from liability for civil damages for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Stanton v. Sims, 134 S. Ct. 3, 4-5 (2013) (internal quotation mark omitted). We apply a two-prong test in determining whether a defendant is entitled to qualified immunity.  Glik, 655 F.3d at 81.  We ask "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation."  Id. (internal quotation marks omitted).

Whether the right was clearly established depends on "(1) the clarity of the law at the time of the alleged . . . violation, and (2) whether, given the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights."  Id. (alternation in original) (internal quotation marks omitted).  The law may be clearly established even if there is no "case directly

-10-

on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." Stanton, 134 S. Ct. at 5 (internal quotation marks omitted). Our task is to determine "whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Glik, 655 F.3d at 81 (internal quotation mark omitted); see also Macdonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014).

On appeal, the officers argue both that there was no First Amendment right to film law enforcement officers during the late-night traffic stop, when Hanslin had a gun and Kelley faced two cars and four individuals, and that, even if such a right existed, it was not clearly established at the time of the traffic stop in this case.

### III.

### A. Retaliatory Prosecution for First Amendment Activity

Gericke claims that her First Amendment rights were violated because the officers, by filing the charge of illegal wiretapping, retaliated against her for her attempt to film the public traffic stop. It is well established that claims of retaliation for the exercise of First Amendment rights are cognizable under section 1983. Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)). In a section 1983 claim of

-11-

retaliatory prosecution for First Amendment activity, a plaintiff must prove that her conduct was constitutionally protected and was a "'substantial'" or "'motivating'" factor for the retaliatory decision, Powell, 391 F.3d at 17 (quoting Mt. Healthy, 429 U.S. at 287), and that there was no probable cause for the criminal charge, Hartman v. Moore, 547 U.S. 250, 265-66 (2006).[7] Retaliation is always reprehensible, and, regardless of whether the underlying activity is constitutionally protected, it is obviously improper for officers to invoke criminal laws for retaliatory purposes. However, the plaintiff's activity must be constitutionally protected in order to bring a section 1983 claim of First Amendment retaliation.[8]

---

[7] In holding that the plaintiff must plead and prove an absence of probable cause for a retaliatory prosecution claim, the Supreme Court observed that "[i]t may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." Hartman, 547 U.S. at 260. The Court reasoned that evidence regarding probable cause "will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation." Id. at 261. On this interlocutory appeal, the officers have not challenged the district court's probable cause ruling. Therefore, we treat the lack of probable cause as a given for the purpose of this appeal.

[8] Even if the activity is not constitutionally protected, a state law claim, such as malicious prosecution, might lie if the elements of such a claim are met. Gericke in fact also brought such a malicious prosecution claim, which is not before us on this interlocutory appeal, and the district court ruled that the claim survived the officers' motions for summary judgment.

If Gericke was exercising a clearly established First Amendment right, then it is in turn clearly established that the police could not retaliate for such activity by charging her with illegal wiretapping without probable cause. Therefore, to determine whether Gericke has a colorable section 1983 claim, we must analyze (1) whether Gericke was exercising a constitutionally protected right to film the police during the traffic stop, and (2) whether that right was clearly established at the time of the stop.

**B.  Was Gericke Exercising a First Amendment Right to Film the Traffic Stop?**

In <u>Glik</u>, the plaintiff filmed several police officers arresting a young man on the Boston Common. <u>Glik</u>, 655 F.3d at 79. Recognizing that it is firmly established that the First Amendment protects "a range of conduct" surrounding the gathering and dissemination of information, we held that the Constitution protects the right of individuals to videotape police officers performing their duties in public. <u>Id.</u> at 82. Gericke attempted to videotape Sergeant Kelley during the traffic stop of Hanslin. Thus, the threshold question here is whether the occasion of a traffic stop places Gericke's attempted filming outside the constitutionally protected right to film police that we discussed in <u>Glik</u>. It does not.

In <u>Glik</u>, we explained that gathering information about government officials in a form that can be readily disseminated "serves a cardinal First Amendment interest in protecting and

-13-

promoting 'the free discussion of governmental affairs.'" Glik,
655 F.3d at 82 (quoting Mills v. Alabama, 384 U.S. 214, 218
(1966)). Protecting that right of information gathering "not only
aids in the uncovering of abuses, but also may have a salutary
effect on the functioning of government more generally." Id. at
82-83 (citations omitted). Those First Amendment principles apply
equally to the filming of a traffic stop and the filming of an
arrest in a public park. In both instances, the subject of filming
is "police carrying out their duties in public." Id. at 82. A
traffic stop, no matter the additional circumstances, is
inescapably a police duty carried out in public. Hence, a traffic
stop does not extinguish an individual's right to film.

This is not to say, however, that an individual's
exercise of the right to film a traffic stop cannot be limited.
Indeed, Glik remarked that "a traffic stop is worlds apart from an
arrest on the Boston Common in the circumstances alleged." Glik,
655 F.3d at 85. That observation reflected the Supreme Court's
acknowledgment in Fourth Amendment cases that traffic stops may be
"'especially fraught with danger to police officers'" and thus
justify more invasive police action than would be permitted in
other settings. Arizona v. Johnson, 555 U.S. 323, 330 (2009)
(quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983)).[9]

_____

[9] In a traffic stop, for example, officers may insist that
passengers exit the vehicle without even a reasonable suspicion
that they were engaged in wrongdoing. Maryland v. Wilson, 519 U.S.

-14-

Reasonable restrictions on the exercise of the right to film may be imposed when the circumstances justify them. See Glik, 655 F.3d at 84 (the exercise of the right to film may be subject to reasonable time, place, and manner restrictions); ACLU of Ill. v. Alvarez, 679 F.3d 583, 607 (7th Cir. 2012) (reasonable orders to maintain safety and control, which have incidental effects on an individual's exercise of the First Amendment right to record, may be permissible).

The circumstances of some traffic stops, particularly when the detained individual is armed, might justify a safety measure -- for example, a command that bystanders disperse -- that would incidentally impact an individual's exercise of the First Amendment right to film. Such an order, even when directed at a person who is filming, may be appropriate for legitimate safety reasons. However, a police order that is specifically directed at the First Amendment right to film police performing their duties in public may be constitutionally imposed only if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties. Glik's admonition that, "[i]n our society, police officers are expected to endure significant

408, 413-15 (1997). A police officer may also request identifying information from passengers in a traffic stop without particularized suspicion that they pose a safety risk or are violating the law, "[s]o long as the request [does] not 'measurably extend the duration of the stop.'" United States v. Fernandez, 600 F.3d 56, 57, 62 (1st Cir. 2010) (quoting Johnson, 555 U.S. at 333).

-15-

burdens caused by citizens' exercise of their First Amendment rights" will bear upon the reasonableness of any order directed at the First Amendment right to film, whether that order is given during a traffic stop or in some other public setting. Glik, 655 F.3d at 84 (citing City of Houston v. Hill, 482 U.S. 451, 461 (1987)). We have made clear that "[t]he same restraint demanded of police officers in the face of 'provocative and challenging' speech, must be expected when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces." Glik, 655 F.3d at 84 (citations omitted) (quoting Hill, 482 U.S. at 461).

Importantly, an individual's exercise of her First Amendment right to film police activity carried out in public, including a traffic stop, necessarily remains unfettered unless and until a reasonable restriction is imposed or in place. This conclusion follows inescapably from the nature of the First Amendment right, which does not contemplate self-censorship by the person exercising the right. See generally Baggett v. Bullitt, 377 U.S. 360, 372 n.10 (1964) ("[T]he conduct proscribed must be defined specifically so that the person or persons affected remain secure and unrestrained in their rights to engage in activities not encompassed by the [restriction]." (internal quotation mark omitted)); Herndon v. Lowry, 301 U.S. 242, 259 (1937) ("The appellant had a constitutional right to address meetings and

organize parties unless in so doing he violated some prohibition of a valid statute."); Dean v. Byerley, 354 F.3d 540, 551 (6th Cir. 2004) ("Although the government may restrict the [First Amendment] right [to use streets for assembly and communication] through appropriate regulations, that right remains unfettered unless and until the government passes such regulations."). Such a restriction could take the form of a reasonable, contemporaneous order from a police officer, or a preexisting statute, ordinance, regulation, or other published restriction with a legitimate governmental purpose.

Under Gericke's version of the facts, no such restriction was imposed or in place.[10] According to Gericke, she immediately complied with all police orders: she returned to her car with her camera when Sergeant Kelley asked her to do so, he never ordered her to stop filming, and once she pulled into the parking lot, he never asked her to leave the scene. Therefore, under Gericke's version of the facts, her right to film remained unfettered, and a jury could supportably find that the officers violated her First Amendment right by filing the wiretapping charge without probable cause in retaliation for her attempted filming.

---

[10] We do not consider whether the wiretapping statute amounted to a reasonable time, place, and manner restriction because the officers have not in any way challenged on appeal the district court's ruling that there was no probable cause for the wiretapping charge.

-17-

**C. Was the Right to Film The Traffic Stop Clearly Established?**

In <u>Glik</u>, we held that, "though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space" was clearly established by the time of the underlying events in the case. <u>Glik</u>, 655 F.3d at 85. Our observation that the right to film is not unqualified recognized that the right can be limited by reasonable time, place, and manner restrictions. <u>Id.</u> at 84. Gericke's attempt to film Sergeant Kelley during the traffic stop was unmistakably an attempt to film a law enforcement officer in the discharge of his duties in a public space. Therefore, as the events in <u>Glik</u> occurred well over two years before the events here, Gericke's right to film the traffic stop was clearly established unless it was reasonably restricted.

Under Gericke's account, no order to leave the area or stop filming was given. Hence, we need not analyze whether a reasonable officer could have believed that the circumstances surrounding this traffic stop allowed him to give such an order. That hypothetical scenario involving a possible restriction on the right to film is irrelevant to this interlocutory appeal. In the absence of a reasonable restriction, it is self-evident, based on first principles, that Gericke's First Amendment right to film

-18-

police carrying out their duties in public remained unfettered.[11] Under Gericke's account, she was permissibly at the site of the police encounter with Hanslin.  It would be nonsensical to expect Gericke to refrain from filming when such filming was neither unlawful nor the subject of an officer's order to stop.  In the absence of such restrictions, a reasonable police officer necessarily would have understood that Gericke was exercising a clearly established First Amendment right.

As we explained above, claims of retaliation for the exercise of clearly established First Amendment rights are cognizable under section 1983.  See Powell, 391 F.3d at 16.  Thus, under Gericke's version of the facts, any reasonable officer would have understood that charging Gericke with illegal wiretapping for attempted filming that had not been limited by any order or law violated her First Amendment right to film.[12]  "'[T]he contours of [the] right [were] sufficiently clear' that every 'reasonable

_____

[11] In Glik, we recognized that "some constitutional violations are 'self-evident' and do not require particularized case law to substantiate them."  Glik, 655 F.3d at 85 (citing Lee v. Gregory, 363 F.3d 931, 936 (9th Cir. 2004)).  We specifically observed that the "terseness" of our acknowledgment of a journalist's First Amendment right to film officials in Iacobucci v. Boulter, 193 F.3d 14 (1st Cir. 1999), "implicitly speaks to the fundamental and virtually self-evident nature of the First Amendment's protections in this area."  Glik, 655 F.3d at 84-85.

[12] As we explained in note 10, supra, the officers do not challenge the finding of the district court that there was no probable cause to believe that Gericke had violated the wiretapping statute.

official would have understood that what he [was] doing violate[d] that right.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  Hence, at this stage of the litigation, the officers are not entitled to qualified immunity.[13]

## IV.

Under Gericke's version of the facts, where there was no police order to stop filming or leave the area, a jury could supportably find that the officers violated her First Amendment right by filing the wiretapping charge against her because of her attempted filming of Sergeant Kelley during the traffic stop.  It was clearly established at the time of the stop that the First Amendment right to film police carrying out their duties in public, including a traffic stop, remains unfettered if no reasonable restriction is imposed or in place.  Accordingly, we hold that the district court properly denied qualified immunity to the officers on Gericke's section 1983 claim that the wiretapping charge

---

[13] Of course, a trial might leave a fact-finder with a different view of whether Sergeant Kelley ordered Gericke to leave the area or stop filming.  That view, in turn, might affect the court's analysis of the availability of qualified immunity to the officers.  See Swain v. Spinney, 117 F.3d 1, 10 (1st Cir. 1997) ("We recognize that the immunity question should be resolved, where possible, in advance of trial.  However, disposition of the question on summary judgment is not always possible. . . . There are . . . factual issues, potentially turning on credibility, that must be resolved by the trier of fact.  Only after the resolution of these conflicts may the trial court apply the relevant law on objective reasonableness." (citation omitted)).

constituted retaliatory prosecution in violation of the First Amendment.

**Affirmed**.