PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-1650

———————

RICHARD FIELDS,
                Appellant

v.

CITY OF PHILADELPHIA; SISCA,
POLICE OFFICER, BADGE NO. 9547;
JOE DOE, AN UNKNOWN PHILADELPHIA
POLICE OFFICER

———————

No. 16-1651

———————

AMANDA GERACI,
                Appellant

v.

CITY OF PHILADELPHIA; DAWN BROWN,
POLICE OFFICER, BADGE NO. 2454;
TERRA M. BARROW, POLICE OFFICER,
BADGE NO. 1147; NIKKI L. JONES,
POLICE OFFICER, BADGE NO. 2549;

RHONDA SMITH, POLICE OFFICER,
BADGE NO. 1373

———————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 2-14-cv-04424/05264)
District Judge: Honorable Mark A. Kearney

———————————

Argued May 9, 2017

Before: AMBRO, RESTREPO,
and NYGAARD, Circuit Judges

(Opinion filed: July 7, 2017)

Jonathan H. Feinberg, Esquire
Kairys Rudovsky Messing & Reinberg
718 Arch Street, Suite 501 South
Philadelphia, PA   19106

John J. Grogan, Esquire
Peter E. Leckman, Esquire
Langer Grogan & Diver
1717 Arch Street, Suite 4130
Philadelphia, PA   19103

Seth Kreimer, Esquire
University of Pennsylvania School of Law
3400 Chestnut Street
Philadelphia, PA   19104

Mary Catherine Roper, Esquire
Molly M. Tack-Hopper, Esquire    (Argued)
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA   19106

      Counsel for Appellants

Craig R. Gottlieb, Esquire       (Argued)
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
One Parkway
Philadelphia, PA   19102

      Counsel for Appellees

Dorothy A. Hickok, Esquire
Alfred W. Putnam, Jr., Esquire
Mark D. Taticchi, Esquire
Drinker Biddle & Reath
18th & Cherry Streets
One Logan Square, Suite 2000
Philadelphia, PA   19103

Ilya Shapiro, Esquire
Cato Institute
1000 Massachusetts Ave., N.W.
Washington, DC   20001

      Counsel for Amicus Appellant
      Cato Institute

Eli Segal, Esquire

Pepper Hamilton
217 Ryers Avenue
Philadelphia, PA  19103

Counsel for Amicus Appellant
Society for Photographic Education

Sharon M. McGowan, Esquire
April J. Anderson, Esquire
Tovah R. Calderon, Esquire
United States Department of Justice
Civil Rights Division, Appellate Section, RFK 3724
P.O. Box 14403
Ben Franklin Station
Washington, DC   20044

Counsel for Amicus Appellant
United State of America

Bruce D. Brown, Esquire
Gregg P. Leslie, Esquire
The Reporters Committee for Freedom of the Press
1156 15th Street, N.W., Suite 1250
Washington, DC  20005

Counsel for Amicus Appellant
Reporters Committee for Freedom of the Press and
31 Media Organizations

Sophia S. Cope, Esquire
Adam Schwartz, Esquire
Electronic Frontier Foundation
815 Eddy Street

San Francisco, CA   94109

Counsel for Amicus Appellant
Electronic Frontier Foundation

Robert J. LaRocca, Esquire
Kohn Swift & Graf
One South Broad Street, Suite 2100
Philadelphia, PA   19107

Counsel for Amicus Appellant
First Amendment Law Professors

Patrick G. Geckle, Esquire
1500 John F. Kennedy Boulevard
Two Penn Center Plaza, Suite 1850
Philadelphia, PA   19102

John Burton, Esquire
The Marine Building
128 North Fair Oaks Avenue
Pasadena, CA   91103

David Milton, Esquire
Law Offices of Howard Friedman, PC
90 Canal Street, Fifth Floor
Boston, MA   02114

Counsel for Amicus Appellant
National Police Accountability Project

Jason P. Gosselin, Esquire
Drinker Biddle & Reath
18th & Cherry Streets
One Logan Square, Suite 2000
Philadelphia, PA   19103

John W. Whitehead, Esquire
Douglas R. McKusick, Esquire
Christopher F. Moriarty, Esquire
The Rutherford Institute
P.O. Box 7482
Charlottesville, VA   22906

  Counsel for Amicus Appellant
  Rutherford Institute

————————————

OPINION OF THE COURT

————————————

AMBRO, <u>Circuit Judge</u>

  In 1991 George Holliday recorded video of the Los Angeles Police Department officers beating Rodney King and submitted it to the local news.  Filming police on the job was rare then but common now.  With advances in technology and the widespread ownership of smartphones, "civilian recording of police officers is ubiquitous."  Jocelyn Simonson, *Copwatching*, 104 Cal. L. Rev. 391, 408 (2016); *see* Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record*, 159 U. Pa. L. Rev. 335, 337 (2011).  These recordings have both exposed police misconduct and exonerated officers from errant

charges. However, despite the growing frequency of private citizens recording police activity and its importance to all involved, some jurisdictions have attempted to regulate the extent of this practice. Individuals making recordings have also faced retaliation by officers, such as arrests on false criminal charges and even violence.

This case involves retaliation. Richard Fields and Amanda Geraci attempted to record Philadelphia police officers carrying out official duties in public and were retaliated against even though the Philadelphia Police Department's official policies recognized that "[p]rivate individuals have a First Amendment right to observe and record police officers engaged in the public discharge of their duties." J.A. 1187. No party contested the existence of the First Amendment right. Yet the District Court concluded that neither Plaintiff had engaged in First Amendment activity because the conduct—the act of recording—was not sufficiently expressive. However, this case is not about whether Plaintiffs expressed themselves through conduct. It is whether they have a First Amendment right of access to information about how our public servants operate in public.

Every Circuit Court of Appeals to address this issue (First, Fifth, Seventh, Ninth, and Eleventh) has held that there is a First Amendment right to record police activity in public. *See Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014); *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012); *Glik v. Cunniffe,* 655 F.3d 78 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995). Today we join this growing consensus. Simply put, the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public.

## I.  BACKGROUND

In September 2012, Amanda Geraci, a member of the police watchdog group "Up Against the Law," attended an anti-fracking protest at the Philadelphia Convention Center. She carried her camera and wore a pink bandana that identified her as a legal observer.  About a half hour into the protest, the police acted to arrest a protestor.  Geraci moved to a better vantage point to record the arrest and did so without interfering with the police.  An officer abruptly pushed Geraci and pinned her against a pillar for one to three minutes, which prevented her from observing or recording the arrest.  Geraci was not arrested or cited.

One evening in September 2013, Richard Fields, a sophomore at Temple University, was on a public sidewalk where he observed a number of police officers breaking up a house party across the street.  The nearest officer was 15 feet away from him.  Using his iPhone, he took a photograph of the scene.  An officer noticed Fields taking the photo and asked him whether he "like[d] taking pictures of grown men" and ordered him to leave.   J.A. 8.  Fields refused, so the officer arrested him, confiscated his phone, and detained him. The officer searched Fields' phone and opened several videos and other photos.  The officer then released Fields and issued him a citation for "Obstructing Highway and Other Public Passages."  These charges were withdrawn when the officer did not appear at the court hearing.

Fields and Geraci brought 42 U.S.C. § 1983 claims against the City of Philadelphia and certain police officers. They alleged that the officers illegally retaliated against them for exercising their First Amendment right to record public police activity and violated their Fourth Amendment right to be free from an unreasonable search or seizure.

They also pointed out that the City's Police Department's official policies recognized their First Amendment right. In 2011 the Department published a memorandum advising officers not to interfere with a private citizen's recording of police activity because it was protected by the First Amendment. In 2012 it published an official directive reiterating that this right existed. Both the memorandum and directive were read to police officers during roll call for three straight days. And in 2014, after the events in our case and the occurrence of other similar incidents, the Department instituted a formal training program to ensure that officers ceased retaliating against bystanders who recorded their activities.

The District Court nonetheless granted summary judgment in favor of Defendants on the First Amendment claims. They did not argue against the existence of a First Amendment right, but rather contended that the individual officers were entitled to qualified immunity and that the City could not be vicariously liable for the officers' acts. Yet the District Court on its own decided that Plaintiffs' activities were not protected by the First Amendment because they presented no evidence that their "conduct may be construed as expression of a belief or criticism of police activity." *Fields v. City of Philadelphia*, 166 F. Supp. 3d 528, 537 (E.D. Pa. 2016). When confronted by the police, Plaintiffs did not express their reasons for recording. Their later deposition testimony showed that Geraci simply wanted to observe and Fields wanted to take a picture of an "interesting" and "cool" scene. *Id.* at 539. In addition, neither testified of having an intent to share his or her photos or videos. *Id.* The District Court thus concluded that, "[a]bsent any authority from the Supreme Court or our Court of Appeals, we decline to create a new First Amendment right for citizens to photograph officers when they have no expressive purpose such as challenging police actions." *Id.* at 542.

Because of this ruling, the District Court did not reach the issues of qualified immunity or municipal liability. However, it allowed the Fourth Amendment claims to go to trial. *Id.* ("The citizens are not without remedy because once the police officer takes your phone, alters your technology, arrests you or applies excessive force, we proceed to trial on the Fourth Amendment claims."). By stipulation, Plaintiffs dismissed their Fourth Amendment claims so that they could immediately appeal the First Amendment ruling.

## II.  JURISDICTION AND STANDARDS

The District Court had subject matter jurisdiction over these federal civil rights claims under 28 U.S.C. §§ 1331 & 1343, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment. *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). It "is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Id.* (alteration in original and citation omitted). Because this is a First Amendment case, we must also "engage in a searching, independent factual review of the full record." *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 186 (3d Cir. 2008) (citations omitted).

## III.  ORDER OF ANALYSIS

Defendants ask us to avoid ruling on the First Amendment issue. Instead, they want us to hold that, regardless of the right's existence, the officers are entitled to qualified immunity and the City cannot be vicariously liable for the officers' acts. We reject this invitation to take the easy way out. Because this First Amendment issue is of great importance and the recording of police activity is a

widespread, common practice, we deal with it before addressing, if needed, defenses to liability.

In *Saucier v. Katz*, the Supreme Court held that courts must determine whether a constitutional right existed before deciding if it had been "clearly established" such that defendants would not be entitled to qualified immunity. 533 U.S. 194, 200-01 (2001). Less than a decade later, however, the Court reversed course in *Pearson v. Callahan*, holding that courts instead have the discretion to choose to address immunity first and bypass the substantive constitutional issue. 555 U.S. 223, 236 (2009). We have not ruled on the First Amendment right, instead merely holding that at the time of our rulings the claimed right was not clearly established. *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010); *True Blue Auctions v. Foster*, 528 F. App'x 190 (3d Cir. 2013).

In the years since, First Amendment issues from the recording of police activity recur, and they deal directly with constitutional doctrine. With technological progress and the ubiquity of smartphone ownership—especially in the years since our *Kelly* decision—we are now in an age where the public can record our public officials' conduct and easily distribute that recording widely. This increase in the observation, recording, and sharing of police activity has contributed greatly to our national discussion of proper policing. Consequently, police departments nationwide, often with input from the U.S. Department of Justice, are developing polices addressing precisely these issues, and our opinion can assist in their efforts to comply with the Constitution. Moreover, in the case before us the constitutional question is not "so factbound that [our] decision [will] provide[] little guidance for future cases." *Pearson*, 555 U.S. at 237. All we need to decide is whether the First Amendment protects the act of recording police

11

officers carrying out official duties in public places. We also have excellent briefing on appeal, including counsel for the parties and eight *amici*, including the U.S. Department of Justice, the Cato Institute, well-known First Amendment law professors, and some of the largest news organizations in the country. We therefore address the First Amendment question before moving to the defenses.

## IV.    THE FIRST AMENDMENT RIGHT TO RECORD

The District Court concluded that Plaintiffs engaged in conduct only (the act of making a recording) as opposed to expressive conduct (using the recording to criticize the police or otherwise comment on officers' actions). It did so by analogy, applying the "expressive conduct" test used to address symbolic speech: "Conduct is protected by the First Amendment when the nature of the activity, combined with the factual context and environment in which it was undertaken, shows that the activity was sufficiently imbued with elements of communication to fall within the First Amendment's scope." *Fields*, 166 F. Supp. 3d at 534 & n.34 (quoting *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002)).

We disagree on various fronts. Foremost is that the District Court focused on whether Plaintiffs had an expressive intent, such as a desire to disseminate the recordings, or to use them to criticize the police, *at the moment when* they recorded or attempted to record police activity. *See id.* at 534-35. This reasoning ignores that the value of the recordings may not be immediately obvious, and only after review of them does their worth become apparent. The First Amendment protects actual photos, videos, and recordings, *see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011), and for this protection to have meaning the Amendment must also protect the act of creating that material. There is no practical

difference between allowing police to prevent people from taking recordings and actually banning the possession or distribution of them. *See Alvarez*, 679 F.3d at 596 ("Restricting the use of an audio or audiovisual recording device suppresses speech just as effectively as restricting the dissemination of the resulting recording."); *see also* Cato Institute *Amicus* Br. 7 ("[B]oth precedent and first principles demonstrate that the First Amendment protects the process of capturing inputs that may yield expression, not just the final act of expression itself"); Kreimer, 159 U. Pa. L. Rev. at 366 ("[T]he threat of arrest remains a potent deterrent to spontaneous photographers who have no deep commitment to capturing any particular image."). As illustrated here, because the officers stopped Ms. Geraci from recording the arrest of the protestor, she never had the opportunity to decide to put any recording to expressive use.

Plaintiffs and some *amici* argue that the act of recording is "inherently expressive conduct," like painting, writing a diary, dancing, or marching in a parade. *See, e.g.*, First Amendment Law Professors *Amicus* Br. 8 ("If writing in an undistributed diary is speech, making an undistributed recording can be characterized as speech as well."); Society for Photographic Education *Amicus* Br. 2 ("Making a photograph merits First Amendment protection because it is artistic expression just the same as painting a landscape, sketching a street scene, or sculpting a statue."); *Tenafly Eruv Ass'n*, 309 F.3d at 160 ("'Parades are thus a form of expression, not just motion . . . .'") (quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 568 (1995)). Regardless of the merits of these arguments, our case is not about people attempting to create art with police as their subjects. It is about recording police officers performing their official duties.

13

The First Amendment protects the public's right of access to information about their officials' public activities. It "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l. Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978). Access to information regarding public police activity is particularly important because it leads to citizen discourse on public issues, "the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers,* 461 U.S. 138, 145 (1983)); *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964) (recognizing the "paramount public interest in a free flow of information to the people concerning public officials, their servants"). That information is the wellspring of our debates; if the latter are to be "'uninhibited, robust, and wide-open,'" *Snyder*, 562 U.S. at 452 (quoting *N. Y. Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)), the more credible the information the more credible are the debates.

To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts. Hence to record is to see and hear more accurately. Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media. Accordingly, recording police activity in public falls squarely within the First Amendment right of access to information. As no doubt the press has this right, so does the public. *See PG Publ'g. Co. v. Aichele*, 705 F.3d 91, 99 (3d Cir. 2013); *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972).

Bystander videos provide different perspectives than police and dashboard cameras, portraying circumstances and surroundings that police videos often do not capture. Civilian

14

video also fills the gaps created when police choose not to record video or withhold their footage from the public. *See* Nat'l Police Accountability Project *Amicus* Br. 7 (noting that "[a] recent survey of 50 major police departments' policies on body cameras revealed that many policies either failed to make clear when officers must turn on their body cameras, gave officers too much discretion when to record, or failed to require explanations when officers did not record") (citation omitted).

The public's creation of this content also complements the role of the news media. Indeed, citizens' gathering and disseminating "newsworthy information [occur] with an ease that rivals that of the traditional news media." 2012 U.S. D.O.J. Letter to Baltimore Police Department; J.A. 1684. *See also Glik*, 655 F.3d at 78 ("The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper."). In addition to complementing the role of the traditional press, private recordings have improved professional reporting, as "video content generated by witnesses and bystanders has become a common component of news programming." The Reporters Committee for Freedom of the Press and 31 Media Organizations *Amicus* Br. 11; *see also id.* at 2 ("Today, the first source of information from the scene of a newsworthy event is frequently an ordinary citizen with a smart phone."). And the inclusion of "bystander video enriches the stories journalists tell, routinely adding a distinct, first-person perspective to news coverage." *Id.* at 12.

Moreover, the proliferation of bystander videos has "spurred action at all levels of government to address police

15

misconduct and to protect civil rights." *See* Nat'l Police Accountability Proj. *Amicus* Br. 1. These videos have helped police departments identify and discipline problem officers. They have also assisted civil rights investigations and aided in the Department of Justice's work with local police departments. And just the act of recording, regardless what is recorded, may improve policing. *See Glik*, 655 F.3d at 82-83. Important to police is that these recordings help them carry out their work. They, every bit as much as we, are concerned with gathering facts that support further investigation or confirm a dead-end. And of particular personal concern to police is that bystander recordings can "exonerate an officer charged with wrongdoing." *Turner*, 848 F.3d at 689.

We do not say that all recording is protected or desirable. The right to record police is not absolute. "[I]t is subject to reasonable time, place, and manner restrictions." *Kelly*, 622 F.3d at 262; *see Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999). But in public places these restrictions are restrained.

We need not, however, address at length the limits of this constitutional right. Defendants offer nothing to justify their actions. Fields took a photograph across the street from where the police were breaking up a party. Geraci moved to a vantage point where she could record a protestor's arrest, but did so without getting in the officers' way. If a person's recording interferes with police activity, that activity might not be protected. For instance, recording a police conversation with a confidential informant may interfere with an investigation and put a life at stake. But here there are no countervailing concerns.

In sum, under the First Amendment's right of access to information the public has the commensurate right to

16

record—photograph, film, or audio record—police officers conducting official police activity in public areas.

## V.     QUALIFIED IMMUNITY

Having decided the existence of this First Amendment right, we now turn to whether the officers are entitled to qualified immunity.  We conclude they are.

Government actors are entitled to qualified immunity unless they violated a constitutional right "so clearly established that '*every reasonable official* would have understood that what he is doing violates that right.'" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (quoting *Reichle v. Howards*, 566 U.S. 658, 659 (2012)) (emphasis in original).   "In other words, existing precedent must have placed the statutory or constitutional question *beyond debate*."   *Id.* (quoting *Reichle*, 566 U.S. at 664) (emphasis in original).   We do not need Supreme Court precedent or binding Third Circuit precedent to guide us if there is a "robust consensus of cases of persuasive authority in the Courts of Appeals."  *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247–48 (3d Cir. 2016) (alteration and citations omitted).   District court decisions, though not binding, also "play a role in the qualified immunity analysis."  *Doe v. Delie*, 257 F.3d 309, 321 n.10 (3d Cir. 2001).  To determine whether the right is clearly established, we look at the state of the law when the retaliation occurred, here in 2012 (Geraci) and 2013 (Fields).  *See id.*

To conduct the clearly established inquiry, we "frame the right 'in light of the specific context of the case, not as a broad general proposition,'" *L.R.*, 836 F.3d at 247–48 (citation omitted), as it needs to be "specific enough to put 'every reasonable official' on notice of it." *Zaloga*, 841 F.3d at 175 (citation omitted).  At issue here is Plaintiffs' ability to

record the police carrying out official duties in public. We have never held that such a right exists, only that it might. *See Gilles v. Davis*, 427 F.3d 197, 212 n.14 (3d Cir. 2005) ("[V]ideotaping or photographing the police in the performance of their duties on public property may be a protected activity."). In 2010 we held that there was no clearly established right for the public to do so, at least in the context of a police traffic stop. *Kelly*, 622 F.3d at 262 ("We find these cases insufficiently analogous to the facts of this case to have put Officer Rogers on notice of a clearly established right to videotape police officers during a traffic stop [in 2007]."). Only a few years later in 2013, in a non-precedential opinion, we held that "[e]ven if the distinction between traffic stops and public sidewalk confrontations is [ ] meaningful . . . [,] our case law does not clearly establish a right to videotape police officers performing their duties [in 2009]." *True Blue Auctions*, 528 F. App'x at 192-93. So to resolve whether the right has become clearly established after these decisions, we must decide whether a "robust consensus" has emerged that puts the existence of this First Amendment right "beyond debate." *Zaloga*, 841 F.3d at 175.

Plaintiffs contend the absence of Circuit precedent does not end the inquiry, as after the events in *Kelly* and *True Blue* the Philadelphia Police Department adopted official policies recognizing the First Amendment right of citizens to record police in public. As plausible as that may be on the surface, it does not win the argument. With one breath Plaintiffs assert that these policies clearly established their legal right, but for purposes of municipal liability (an issue we remand) they vigorously argue that the policies were utterly ineffective in conveying to the officers that this right clearly existed. And Plaintiffs have compiled evidence indicating this was so. For example, they point out that Captain Francis Healy, the policy advisor to the Police Commissioner, testified that, notwithstanding the adoption of

18

the Department's policies, the "officers didn't understand that there was a constitutional right [to record]." Reply Br. 11 (quoting J.A. 282-83).

As to decisions of other appellate courts relevant to the qualified immunity analysis, Defendants and the District Court argue that those decisions are distinguishable because they involved expressive intent or an intent to distribute. *See, e.g.*, *Alvarez,* 679 F.3d at 588 ("The ACLU intends to publish these recordings online and through other forms of electronic media."); *Fields*, 166 F. Supp. 3d at 538 n.56 ("In *Glik*, the plaintiff expressed concern police were using excessive force arresting a young man in a public park and began recording the arrest on his cell phone[,] and the police then arrested plaintiff. . . . Notably, the plaintiff in *Fordyce* [*v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995)] claimed he was recording a public protect for a local news station."); *see also* D.O.J. *Amicus* Br. 22 n.14 ("[I]n those cases, the plaintiffs' objectives or opinions . . . [to disseminate] were apparent from context. In this respect, Fields's case in particular is one of first impression."). Indeed, the Fifth Circuit just this year recognized that these other appellate decisions did not clearly establish the constitutional right to record. *See Turner*, 848 F.3d at 687.

Where District Courts in our Circuit have held in favor of the First Amendment right, Defendants also distinguish those cases for requiring expressive act or intent, not just recording alone, once again echoing the reasoning of the District Court here. *See Fields*, 166 F. Supp. 3d at 537 ("We find the citizens videotaping and picture-taking in [those district court cases] all contained some element of expressive conduct or criticism of police officers and are patently distinguishable from Fields' and Geraci's activities."). Whether Defendants and the District Court correctly distinguished these cases, we cannot say that the state of the

19

law at the time of our cases (2012 and 2013) gave fair warning so that every reasonable officer knew that, absent some sort of expressive intent, recording public police activity was constitutionally protected. Accordingly, the officers are entitled to qualified immunity.

## VI. MUNICIPAL LIABILITY

Because of its First Amendment ruling, the District Court did not reach whether the City could be held liable for its officers' conduct. *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). While the City contends that there is no genuine issue of material fact and it cannot be held liable as a matter of law, we follow our usual practice of according our District Court colleague the initial opportunity to resolve these contentions.

\* \* \* \* \*

We ask much of our police. They can be our shelter from the storm. Yet officers are public officials carrying out public functions, and the First Amendment requires them to bear bystanders recording their actions. This is vital to promote the access that fosters free discussion of governmental actions, especially when that discussion benefits not only citizens but the officers themselves. We thus reverse and remand for further proceedings.

*Fields v. City of Philadelphia,* No. 16-1650*; Geraci v. City Philadelphia,* No. 16-1651

*Nygaard, J., concurring in the part, dissenting in part.*

I agree with the majority that the cause must be remanded.  Because I conclude that the First Amendment right at issue is and was clearly established, I dissent.

The question of whether a constitutional right is clearly established has to be considered in a real-world context; this is why our analysis is conducted from the perspective of a "reasonable official." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247–48 (3d Cir. 2016) (alteration and citations omitted).  Such an approach protects public officials—particularly our police officers in the field—from uncertainty about the precise boundary of a particular constitutional right when situations arise that have not yet been considered by the courts.  Nonetheless, we must apply this "reasonable official" analysis consistently, recognizing that there are instances—rare though they may be—when any reasonable official in the circumstance would know the boundaries of a constitutional right well before we have ruled on it.  I am confident that this is one of those cases because of the unique combination of a number of factors.

First, as the majority notes, every Circuit Court of Appeals that has considered the issue ruled that there is a First Amendment right to record police activity in public.  Four of these decisions were published before the conduct at issue here, and two of them occurred after our decision in *Kelly v. Borough of Carlisle,* 622 F.3d 248 (3d Cir. 2010), in which we posited that the right was not clearly established at that

time. *See Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012); *Glik v. Cunniffe,* 655 F.3d 78 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995).[1]  I am convinced that such a "robust consensus," alone, sufficiently grounds a ruling that the right is clearly established.  *L.R.*, 836 F.3d at 247–48.  However, our record goes far beyond that.

The Police Department's official policies explicitly recognized this First Amendment right well before the incidents under review here took place.  Captain Frank Healy of the Department's Research and Planning Unit stated that, in 2011, officers did "not understand the police [were] allowed to be taped in public." App. 119 (2013 Healy dep. at 54).  Because there was "some confusion on the street" he testified that there "was a definite need for the policy." App. 121 (2013 Healy dep. at 62).  He said that the Department wanted "to be on the forefront rather than on the back end," of educating its officers on this issue, prompting Police Commissioner Charles Ramsey to request that a policy be written requiring police officers to "allow citizens to record the police."  App. 118 (2013 Healy dep. at 52).  The policy was intended to get "clarification out on the street so the officers knew what their duties [were]."  App. 120 (2013 Healy dep. at 59).  It issued a memorandum in September, 2011 stating that police should reasonably expect to be photographed, videotaped and or audibly recorded by members of the general public.  Commissioner's

---

[1] Two more recent decisions reinforce the trend.  *See Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014).

2

Memorandum 11-01, issued on September 23, 2011, made clear to all Philadelphia police officers that they "shall not" obstruct or prevent this conduct, and that "under no circumstances" were permitted to disable or damage the devices being used. App. 1185.

In the year that followed publication of the memorandum, Internal Affairs received eight complaints by citizens of retaliation by police for recording police performing their duties. App. 1569. Additionally, the U.S. Department of Justice issued recommendations in May, 2012, that all police departments "affirmatively set forth the First Amendment right to record police activity." App. 1675. As a result, the Commissioner directed Captain Healy and his unit to revise the Memorandum to incorporate the Department of Justice recommendations. The revised document was issued as Departmental Directive 145 on November 9, 2012. Like a Memorandum, a Directive is also official Departmental policy, but it covers a topic in greater depth.

Directive 145 plainly requires officers to allow citizens to make recordings of police activity. The Directive uses, verbatim, the language of the Department of Justice's recommendation, stating that its purpose was to "protect the constitutional rights of individuals to record police officers engaged in the public discharge of their duties." App. 1187. It said, further, that "observing, gathering, and disseminating of information . . . is a form of free speech." *Id*. Police officers were prohibited from "blocking, obstructing, or otherwise hindering" recordings made by persons "unless the person making such recording engages in actions that jeopardize the safety of the officer, any suspects or other individuals in the immediate vicinity, violate the law, incite

3

others to violate, or actually obstruct an officer from performing any official duty." *Id.* As it was published, the Department mandated that a sergeant read it at every roll call, Department-wide. Each police officer also received a copy of the Directive and was required to sign that they received it.

Although the Directives declared a First Amendment right well ahead of this Court, the Philadelphia Police Department Commissioner had a desire to "get out ahead" of what he presciently viewed as an inevitable ruling. With all of this, it is indisputable that all officers in the Philadelphia Police Department were put on actual notice that they were required to uphold the First Amendment right to make recordings of police activity. From a practical perspective, the police officers had no ground to claim ambiguity about the boundaries of the citizens' constitutional right here. Mindful of the established trend among the Circuit Courts of Appeals, this combined with this clear Guidance from the Commissioner sufficiently grounds a conclusion that the right to record official, public police activity was clearly established and "beyond debate." *Zaloga*, 841 F.3d at 175 (quoting *Reichle*, 132 S.Ct. at 2093). However, this, too, ignores another piece of the context of this case that should be considered as part of the "reasonable official" inquiry.

The majority cites to the 2011 article of Seth F. Kreimer,[2] in which he notes that, given the ubiquity of personal electronic devices with cameras, "[w]e live, relate, work, and decide in a world where image capture from life is routine, and captured images are part of ongoing discourse, both public and private. Capture of images has become an

---

[2] Professor, University of Pennsylvania Law School.

4

adjunct to memory and an accepted medium of connection and correspondence." Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record*, 159 U. Pa. L. Rev. 335, 337 (2011). If we are to assess the issue from a reasonable officer perspective, we cannot artificially remove him or her from this widespread societal phenomenon. (Indeed, it is not unreasonable to speculate that most—if not all—of the police officers themselves possessed such a personal electronic device at the time that the incidents underlying these cases took place.) A reasonable police officer would have understood, first-hand, the significance of this proliferation of personal electronic devices that have integrated image capture into our daily lives, making it a routine aspect of the way in which people record and communicate events. Apart from any court ruling or official directive, the officers' own lived experience with personal electronic devices (both from the perspective of being the one who is recording and one who is being recorded) makes it unreasonable to assume that the police officers were oblivious to the First Amendment implications of any attempt by them to curtail such recordings.

As I noted above, I concur with the majority's analysis and conclusions regarding the existence of a First Amendment right to record, and agree that the case against the City of Philadelphia should be remanded for further proceedings. However, in light of the social, cultural, and legal context in which this case arose, I am convinced that—in this unique circumstance—no reasonable officer could have denied at the time of the incidents underlying these cases that efforts to prevent people from recording their activities infringed rights guaranteed by the First

Amendment.  For these reasons, I dissent from the majority's conclusion that the police officers are immune from suit.