**Electronically Filed
Supreme Court
SCWC-14-0000986
14-DEC-2017
08:33 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellant,

vs.

THOMAS A. RUSSO,
Petitioner/Defendant-Appellee.

SCWC-14-0000986

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000986; 2DCW-12-0000873)

DECEMBER 14, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

This case arises out of a 2012 incident that occurred on the shoulder of Haleakala Highway in Maui County while Thomas Russo was filming police officers conducting a traffic enforcement operation.  During Russo's filming of the traffic stop with his cell phone, he was arrested for interfering with government operations and other offenses.  Russo was

subsequently charged with failing to comply with a lawful order of a police officer, an offense for which he had not been arrested. Russo has consistently maintained that his filming of police activity was protected by the United States and Hawai'i Constitutions.

We join those jurisdictions that recognize that there is a constitutional right of the public to film the official activities of police officers in a public place. But because we conclude that the record does not support a finding of probable cause that Russo failed to comply with a police officer's order, we do not address whether Russo's constitutional right to access and film the traffic stop was infringed in this case. Accordingly, we vacate the Intermediate Court of Appeals' summary disposition order and affirm the district court's order that dismissed this case with prejudice.

## I.     FACTS AND PROCEDURAL HISTORY

On November 20, 2012, Russo was arrested on Haleakala Highway by Maui Police Department (MPD) Officers Rusty Lawson and John Fairchild for obstructing government operations, resisting arrest, and harassment. Russo was later charged by complaint with failure to comply with a lawful order or direction of a police officer in violation of Hawaii Revised

Statutes (HRS) § 291C-23 (2007)[1] and disorderly conduct in violation of HRS § 711-1101(1)(d) (1993 & Supp. 2003).[2]  At arraignment on January 24, 2013, Russo pleaded not guilty to the charges.

## A.  Motion to Dismiss

On December 27, 2013, Russo filed a motion to dismiss the case against him based on the First Amendment to the United States Constitution, or, alternatively, on the ground that there was no probable cause to support the charges.  In his motion to dismiss, Russo contended that this case was "about a police officer arresting a journalist covering a news story because the officer did not want to be filmed."  Specifically, Russo contended that he was the publisher of Maui Time Publications

---

[1]    HRS § 291C-23 provides as follows:

It shall be a petty misdemeanor for any person to wilfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic.

[2]    HRS § 711-1101 provides, in relevant part, as follows:

(1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:

.  .  .

(d) Creates a hazardous or physically offensive condition by any act which is not performed under any authorized license or permit .  .  .  .

The complaint filed by the State of Hawai'i alleged the disorderly conduct charge as a petty misdemeanor offense under HRS § 711-1101(3).

and engaged in investigative journalism regarding current events, the arts, and other news of Maui County. According to Russo, on November 20, 2012, he pulled over onto the shoulder while driving along Haleakala Highway to investigate an ongoing law enforcement operation. Russo began filming two police officers who were conducting a traffic stop and was arrested for obstructing government operations shortly thereafter.

In his motion to dismiss, Russo argued that the First Amendment to the United States Constitution protects the right to take photographs and videos of public places, which includes the right to film the activities and operations of police officers. Russo contended that the First Amendment right to record police activity is limited only by reasonable time, place, and manner restrictions. Russo submitted that he had complied with all police orders given to him by the MPD officers at the traffic stop that he was filming, that his recording was from a safe distance, and that he did not obstruct the officers conducting the stop. Thus, according to Russo, the case against him should be dismissed because his conduct was protected by the First Amendment.

In the alternative, Russo contended that the case should be dismissed for lack of probable cause. Russo submitted that the charge of failure to comply with a lawful order of a police officer was unsupported by probable cause because he was

actually complying with the police officers' orders and directions. Russo also argued that the statute under which he was charged did not apply to his alleged failure to comply with the officers' order because the law "prohibits a driver from ignoring [a police officer's] traffic directions . . . not an officer yelling at someone on the side of a road." Additionally, Russo argued that the disorderly conduct charge should be dismissed because he was not "disorderly" or "persisting" in disorderly conduct, nor was there any evidence that he was "creating a 'hazardous and/or physically offensive' condition."[3]

In response, the State argued that Russo "did not simply want to record the traffic stop, but wanted to interfere with the administration of the stop." The State acknowledged that other jurisdictions had held videotaping public officials to be protected under the First Amendment. The State submitted, however, that this right has limitations and is subject to reasonable time, place, and manner restrictions. The State contended that the MPD police officers determined that the area

---

[3]    Russo further asserted that even if the court found that probable cause did exist, the disorderly conduct statute under which he was charged was overbroad and void for unconstitutional vagueness, as well as unconstitutional as applied in order to criminalize the filming of police officers. Additionally, Russo asserted that the complaint failed to sufficiently and properly allege the essential elements of the disorderly conduct charge.

where the traffic stop was being conducted was not a reasonable place to film police because it was not safe, and Russo's actions in entering and remaining in the traffic stop area were therefore not constitutionally protected. According to the State, Russo failed to comply with the directives to "step back," to "cease interfering with the traffic stop," and to "stop resisting arrest." Thus, the State submitted that the officers exercised proper caution in addressing the situation and probable cause existed to support the charges.[4]

## B. Hearing on Russo's Motion to Dismiss

At the hearing on Russo's motion to dismiss,[5] the State called MPD Officer Rusty Lawson to testify regarding the events leading to Russo's arrest. Officer Lawson testified that he had been employed by the MPD for eight and a half years and was at that time assigned to the traffic division DUI task force. On November 20, 2012, Officer Lawson was assigned to conduct a specific traffic enforcement called "Operation Recon," during which MPD sought to enforce traffic regulations relating to "lifted vehicles, tires extended beyond the fenders, window

---

[4] The State also rejected Russo's argument that the statutes under which he was charged were void for vagueness and unconstitutionally overbroad, and that the elements of disorderly conduct were deficiently alleged. The State likewise contended that the charge of disorderly conduct was supported by the fact that Russo was consciously attempting to distract Officers Fairchild and Lawson and that "Russo wanted to be arrested."

[5] The Honorable Kelsey T. Kawano presided.

tints, or any other traffic violations [MPD] could see." Officer Lawson testified that he was the acting supervisor of the operation, which involved between five and seven officers, and that he and Officer John Fairchild were positioned in the same area on the side of Haleakala Highway. Officer Lawson testified that he was conducting a traffic stop for a possible window tint violation prior to his interaction with Russo. His unmarked police vehicle was parked on the grassy shoulder of the highway, as was Officer Fairchild's vehicle and the vehicle belonging to the individual subject to the traffic stop.

At this point in Officer Lawson's testimony, the State played a video recording comprised of three individual clips taken by Russo showing the events leading up to Russo's arrest, which had previously been stipulated into evidence by the State and the defense. In the first clip, Russo holds the recording device[6] and can be heard speaking in the background. The device appears to be taking video from behind the windshield of a vehicle parked on the shoulder of Haleakala Highway in which Russo is sitting.

The video depicts Russo exiting his vehicle and walking towards the cars parked in front of him. The camera

---

[6]     The record suggests that Russo used a cellular phone to take the video recordings.

pans along Haleakala Highway as Russo narrates that the road is "backed up" with traffic. The camera then focuses on the vehicles parked ahead on the side of the highway, and two uniformed police officers wearing orange and yellow vests are seen walking near one of the vehicles. Russo continues to walk towards these uniformed officers, and one of the officers-- subsequently identified as Officer Fairchild--can be heard asking Russo to turn his hazard lights on. Russo replies, "Sure I can do that." Officer Fairchild then walks back towards the parked vehicles, and Russo appears to begin walking back towards his vehicle.

In the second clip, the recording begins with the camera pointed towards Russo's parked car. The vehicle's hazard lights are on. Russo appears to begin walking towards the vehicles parked ahead, where Officer Fairchild and the second uniformed police officer--identified as Officer Lawson--are standing.

In the third and final clip, which appears to be an immediate continuation from the second clip, Russo continues to walk towards the vehicles parked ahead. Russo comes into proximity with the closest vehicle, which appears to be an unmarked police car. Officer Fairchild, who is standing next to this first unmarked vehicle, sees Russo approaching and appears to wave his hand. As Russo comes closer to the officer, the

officer again appears to wave his hand to indicate the shoulder of the highway and states to Russo that the police are pulling people over "in this area here." Russo then questions Officer Fairchild as to why the police are pulling people over, to which the officer responds, "Traffic violations." Russo asks Officer Fairchild whether he thinks it is "justifiable to back traffic all the way up to Hali'imaile," and they engage in a brief dialogue regarding the extent of the surrounding traffic. The officer again waves his hand along the highway shoulder and states to Russo, "We're pulling peop--cars over in this area right here okay, so please step off to the side I don't want you to get run over." Russo responds, "Okay."

At this point, Russo appears to begin walking away from Officer Fairchild and towards the second unmarked police vehicle, which is parked immediately behind the car subject to the traffic stop; Officer Lawson can be seen standing at the driver-side window of the vehicle subject to the stop. As Russo approaches the area parallel to the front passenger-side of the stopped vehicle, Officer Lawson leaves his position at the driver-side window and walks around the front of the vehicle towards Russo. The following exchange occurs:

> Officer: Excuse me, sir --
>
> Russo: Yes sir?

> Officer: Can you stand back there?  Can you stand back there?  Don't come over here.  There's a traffic stop being conducted.  Can you stand -- can you stand back there?

As the officer asks Russo to "stand back there," he points backwards in the general direction of Officer Fairchild's and Russo's parked vehicles.

In response to Officer Lawson's request, Russo answers, "Uh -- no, I'm [inaudible]."  Russo is interrupted by the officer, who states, "You're obstructing a government operation."  Russo responds that he is "not obstructing at all" and appears to walk backwards, away from the officer.  Again pointing in the general direction of Russo's vehicle, Officer Lawson states, "Don't intervene . . . this is a traffic stop . . . you need to stand back there."

Russo can then be heard asking, "Where can I stand?"  Russo walks a few steps to the right--away from the highway, and towards what appears to be an adjacent field--and asks, "Can I stand here . . . this is private property, right?"  The officer appears to indicate that Russo cannot stand there, gesturing again in the general direction of Russo's vehicle and stating, "You stand back there, you're on private property."  Russo then takes several steps back towards the highway, closer to the officer, and asks, "Can I stand on public property?"  At this point, Russo can be heard telling Officer Lawson, "Don't -- are you touching me -- you're touching me."  Officer Lawson then

places his right hand on his belt and states, "I'll arrest you for obstructing." Russo repeats that he is "not obstructing anything" and relays that "[he has] got video."

Russo begins walking backwards again, away from the officer and towards Russo's car. Officer Lawson continues to walk towards Russo, repeatedly stating that "there's a traffic stop back here" and asking him to "stand back there." Officer Fairchild then joins Officer Lawson, and both continue to walk towards Russo as he backs away. As he walks backwards, away from the officers, Russo states, "this is more than a traffic stop . . . this is a circus," and he repeats that he is not obstructing anything. Officer Lawson responds that he "told [Russo] five times" and states that he will "place [Russo] under arrest" for "obstructing government operations." Russo then identifies himself by name and relates that he is a member of the media. As he continues to walk backwards and as Officer Lawson continues approaching him, Russo can be heard stating twice, "Don't touch me, officer." Officer Lawson then states, "Sir . . . sir, you need to comply," to which Russo responds, "I am complying officer, I am . . . I am."

The camera tilts down towards the ground as a scuffle ensues, at which point the video recording suggests that Russo is placed under arrest. An officer is heard telling Russo, "Stop resisting, stop resisting," and that the officer was

"sorry about this." Russo replies, "I'm not resisting . . . I was walking backwards, just as the video shows, officer." Russo can then be heard stating, "No, no . . . you're not allowed to take my phone." At this point, the video footage concludes.

After the State played the video, Officer Lawson testified that he directed Russo to "step and/or stand back" around "five, six, seven times." He also testified regarding the procedures that the MPD has in place concerning media contact. When asked to describe the MPD's policy governing when members of the media are permitted to film police activity, Officer Lawson suggested that the MPD may in some situations require a pre-approved media pass:

> I don't think it governs as far as filming the police, but I believe it's a -- I guess a courtesy request of the media to contact the police department for, I guess, what they call like a media pass. Any media from the police department has to go through our chief. I cannot make any statements of the media. But if such, they wanted to come and give, I guess, a courtesy to these guys or to the media to have like a sit-in or like a ride-along, that's no problem, as long as it's cleared with the chief of police.

Officer Lawson further testified that he was not notified by the MPD that the media would be recording the police during Operation Recon.

Following Officer Lawson's testimony, the State called to the stand the individual subject to the traffic stop that was occurring at the time of Russo's arrest (the witness). The witness testified that during the traffic stop, she observed Russo with a phone but did not know that he was taking a video

12

recording until she was told by Officer Lawson. The witness stated that she did not feel scared during the incident and that she never told Officer Lawson that she felt threatened.

Also at the motion to dismiss proceeding, the defense elicited testimony regarding "national standards of care" applicable to filming police officers in public from Mickey H. Osterreicher, who was qualified by the court as an expert witness in the area of film journalism, photography, and journalism. Osterreicher testified that, based upon his review of the video footage, Officer Lawson's directions throughout the encounter were unclear and were not reasonable time, place, or manner restrictions. Russo emphasized in his closing argument that the orders were too vague to comply with, arguing that "Officer Lawson never s[aid], sir, can you move 15 feet away" and instead said only "go over there, go over there."

On July 9, 2014, the district court issued its oral ruling, findings of fact (FOFs), and conclusions of law (COLs) regarding Russo's motion to dismiss. In its FOFs, the court found that Russo complied with Officer Fairchild's request that he turn on his hazard lights. The court also found, however, that Russo was instructed multiple times to step back out of the area where the traffic stop was occurring. The court determined that Russo did not comply with the order to step back and

continued to engage the officers.[7]  In addition, the court determined that the instructions to step back were not specific as to time, place, or manner as testified to by defense expert Osterreicher.

In its COLs, the district court concluded that probable cause did not exist for the arrest of Russo on either charge.  The court determined that HRS § 291C-23, which sets forth the offense of failure to comply with the lawful order of a police officer, did not apply to Russo's conduct.  The court reasoned that under HRS § 291C-21 (2007), the provisions of Parts III to XIV of the traffic code relating to the operation of vehicles refer exclusively to the operation of vehicles upon highways except where a different place is specifically referred to in a given section.  See HRS § 291C-21.  Because the offense of failure to comply with the lawful order of a police officer is codified within Part III of the traffic code, the court determined that, pursuant to HRS § 291C-21, the offense only applies to conduct relating to the operation of vehicles upon highways.  And, since Russo's conduct did not involve operation

_____

[7]     It appears that the district court understood the officers' multiple instructions to stand and/or step back to collectively be a single "lawful direction" or order to do so.  Thus, although the State and the defense have alternatively characterized the question as whether Russo violated an "order" or multiple "orders," we find it most appropriate to consider whether Russo violated the collective order made by Officers Lawson and Fairchild to stand and/or step back.

of a vehicle upon a highway, the court reasoned that the offense of failure to comply with a lawful order of a police officer did not apply.

With respect to the charge of disorderly conduct, the district court concluded that the evidence was entirely unclear as to whether, by failing to follow the officers' directions, Russo created hazardous conditions posing a risk of physical inconvenience or alarm to members of the public within the meaning of the disorderly conduct statute. The court thus determined that there was no probable cause to support the charge.

Regarding Russo's argument based on the First Amendment, the district court concluded that it was Russo's burden to establish that his rights were infringed, and that he failed to do so. The court determined that the case did not involve police officers objecting to Russo videotaping, but, rather, Russo's failure to heed their instructions based on their view that he was hindering their operations. The court also concluded that Russo had not satisfied his burden of demonstrating that the instructions given by the police officers were unconstitutionally vague as to time, place, and manner. However, the court determined that it did not have to base its decision on the constitutional question in light of its other rulings.

15

The district court thus dismissed both charges for lack of probable cause and entered a Notice of Entry of Judgment And/Or Order (Order of Dismissal), which dismissed both charges with prejudice.  The State timely filed a notice of appeal to the Intermediate Court of Appeals (ICA) from the Order of Dismissal.

### C.  ICA Proceedings

In a summary disposition order (SDO), the ICA concluded that the district court erred in dismissing the charge of failure to comply with a lawful order of a police officer.[8] The ICA determined that the restrictive language in HRS § 291C-21 means that, where specific provisions of HRS Chapter 291C, Parts III to XIV, relate to the operation of vehicles, "only the operation of vehicles upon highways is covered unless a different place is specifically referred to in that provision." The failure to comply with a lawful order offense was not limited to the operation of vehicles, the ICA reasoned, and therefore could be applied to Russo's conduct as a pedestrian where he interacted with police officers who were regulating traffic.

---

[8] Because the State did not challenge the district court's dismissal of the disorderly conduct charge, the ICA did not address it on appeal.  The ICA's SDO can be found at State v. Russo, No. CAAP-14-0000986, 2017 WL 1194000 (Haw. App. Mar. 31, 2017).

16

The ICA next considered whether probable cause supported the charge. The ICA determined that probable cause did exist to support the charge of failure to comply with a lawful order of a police officer, relying on the following factual findings of the district court: (1) Russo was informed by the officers involved in traffic enforcement that he was in their area of operations and in danger of being struck by a vehicle; (2) Russo was told multiple times to step back out of the area of operation by the two officers; and (3) Russo did not comply with the officers' instructions.

The ICA majority therefore concluded that the district court erred in dismissing the charge of failure to comply with a lawful order of a police officer in violation of HRS § 291C-23. Accordingly, the ICA vacated the district court's Order of Dismissal and remanded the case for further proceedings.

Chief Judge Craig H. Nakamura issued a concurring and dissenting opinion in which he agreed with the ICA majority's interpretation of HRS §§ 291C-21 and 291C-23, but he disagreed that the charge of failure to comply with a lawful order of a police officer in this case was supported by probable cause. The Chief Judge stated that his review of the video footage showed that "although Russo questioned the officers' authority to order him from the scene, he was complying with the officers' order, retreating and walking backward away from the approaching

17

officers and their area of operation, when the officers arrested
him."  Chief Judge Nakamura thus concluded that probable cause
was lacking because "[t]he video recording shows that Russo did
not willfully fail or refuse to comply with the officers' order
to stand back or move," and that any finding made by the
district court to the contrary was clearly erroneous.  Thus,
Chief Judge Nakamura would have affirmed the district court's
dismissal of the failure to comply charge on the alternative
ground that insufficient probable cause existed to support the
charge.

## II.    STANDARDS OF REVIEW

Probable cause determinations are reviewed on appeal
under a de novo standard.  State v. Kaleohano, 99 Hawai'i 370,
375, 56 P.3d 138, 143 (2002) (citing State v. Navas, 81 Hawai'i
113, 123, 913 P.2d 39, 49 (1996)).

A court's findings of fact are reviewed under the
"clearly erroneous" standard.  Id.  "A finding of fact is
clearly erroneous when, despite evidence to support the finding,
the appellate court is left with the definite and firm
conviction in reviewing the entire evidence that a mistake has
been committed."  Id. (quoting Dan v. State, 76 Hawai'i 423, 428,
879 P.2d 528, 533 (1994)).  A court's conclusions of law are
reviewed under the "right/wrong" standard, which "allows the

appellate court to 'examine the facts and answer the question without being required to give any weight to the trial court's answer to it.'"  Id. (quoting State v. Lopez, 78 Hawai'i 433, 440, 896 P.2d 889, 896 (1995)).

"The interpretation of a statute is a question of law reviewable de novo."  State v. Arceo, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting State v. Camara, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996)).

The court "answers questions of constitutional law by 'exercising our own independent judgment based on the facts of the case.'"  State v. Aplaca, 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001) (quoting State v. Jenkins, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000)).  "Thus, questions of constitutional law are reviewed on appeal 'under the "right/wrong" standard.'"  Id. (quoting Jenkins, 93 Hawai'i at 100, 997 P.2d at 26).

## III.    DISCUSSION

In his application for a writ of certiorari, Russo argues that the district court correctly dismissed the charge of failure to comply with a lawful order of a police officer for lack of probable cause and thus the ICA erred in vacating the Order of Dismissal.  Russo contends that even if the ICA concluded that the district court's interpretation of HRS §

19

291C-23 was incorrect,[9] the ICA was obligated to affirm the dismissal order on the alternative ground that there was no probable cause supporting the complaint against Russo. Specifically, Russo submits that there was no proof that he willfully failed or refused to comply with a police officer's order. Russo also argues that the ICA majority erred in not considering the merits of his First Amendment argument that he has a constitutional right to film police activity, subject to reasonable time, place, and manner restrictions. In addition, Russo submits that the district court wrongly concluded that he had the burden of proof to establish that the police instructions were unreasonable and the command to stand away from the traffic stop was too vague to be a reasonable time, place, and manner restriction.

To resolve the merits of Russo's arguments on certiorari, we consider whether the ICA correctly concluded that the charge of failure to comply with a lawful order of a police officer was supported by probable cause. Because the ICA failed to address Russo's constitutional argument when it vacated the

---

[9]     In light of Russo's conditional acknowledgment of the ICA's interpretation of HRS § 291C-21, we note our agreement with the ICA's reading of the statute. Pursuant to HRS § 291C-21, when a provision codified within Parts III through XIV "relat[es] to the operation of vehicles," that provision must be interpreted to refer only to "the operation of vehicles upon highways" unless otherwise specified. Where the provision is codified within Parts III through XIV but does not "relat[e] to the operation of vehicles," HRS § 291C-21 does not speak to that provision's interpretation.

Order of Dismissal, and because the determination of whether the police officers' order was "lawful" within the meaning of HRS § 291C-23 depends in part on whether the order comported with the state and federal constitutions, we also address the existence of a constitutionally-protected right to photograph and film police officers in public.

## A. "Lawful Order" and First Amendment Implications

A person commits the offense set forth by HRS § 291C-23 when the person willfully fails or refuses to comply with "any lawful order or direction" of a police officer authorized by law to direct, control, or regulate traffic. HRS § 291C-23 (emphasis added). Thus, a necessary predicate to a finding of guilt under HRS § 291C-23 is the existence of a "lawful order or direction" by a police officer. Id.

At the motion to dismiss proceeding and on appeal, Russo has argued that, irrespective of his compliance or alleged noncompliance with the officers' order to "stand over there" or "step back," this order was not "lawful" within the meaning of HRS § 291C-23 because it infringed on his First Amendment right to photograph and film police officers in public. The State appears to acknowledge the existence of this First Amendment right, but it contends that Russo's actions in entering or remaining in the traffic stop area were not constitutionally protected and that the officers' order was a reasonable

21

restriction.  The district court declined to expressly rule on First Amendment grounds, but it concluded that it was Russo's burden to demonstrate that the order was unconstitutionally vague as to time, place, or manner, and that Russo had failed to make this showing.  The ICA did not consider any constitutional implications of the officers' conduct when it vacated the district court's dismissal order and remanded the case for further proceedings, despite the fact that Russo had urged the ICA to affirm the dismissal on First Amendment grounds.

Although not addressed by the ICA, the constitutionality of the officers' order to stand or step back is inextricably intertwined with the State's allegation that Russo violated HRS § 291C-23.  If the order did not comport with the federal and state constitutions, the Hawaii Revised Statutes, or other principles of law, it was not "lawful" within the meaning of the statute, and HRS § 291C-23 would thus impose no requirement of compliance.[10]  Further, the issuance of a lawful order or direction is an essential element of the offense set forth in HRS § 291C-23, thereby indicating that, contrary to the district court's conclusion, it is the State's burden to

_____

[10]    See, e.g., State v. Ausmus, 85 P.3d 864, 869 (Or. 2003) (holding that in the context of a disorderly conduct statute that prohibited certain refusals to "comply with a lawful order of the police to disperse," the term "lawful order" means "an order that is authorized by, and is not contrary to, substantive law").

prove the existence of a "lawful order" rather than the defendant's burden to prove that the order was unlawful.[11] Accordingly, we address the existence of a First Amendment right to photograph and film the police and its limitations.[12]

The First Amendment to the United States Constitution states in relevant part that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. Article I, section 4 of the Hawaiʻi Constitution likewise provides that "[n]o law shall be enacted . . . abridging the freedom of speech or of the press." Haw. Const. art. I, § 4. This court has interpreted the free speech rights

---

[11] In the context of other offenses that render unlawful the refusal to comply with the order of a court or police officer, Hawaiʻi courts have likewise interpreted the issuance of the predicate order to constitute an essential element of the charge that must be proved beyond a reasonable doubt by the State. See State v. Kalaola, 124 Hawaiʻi 43, 49, 237 P.3d 1109, 1115 (2010) (setting forth that the offense of failure to disperse upon law enforcement officer's order has, as an essential element, that the defendant was "ordered by a law enforcement officer to disperse," which the State must prove beyond a reasonable doubt); State v. Alvarez, 96 Hawaiʻi 42, 25 P.3d 817 (App. 2001) (stating that the offense of failure to obey a lawful order issued pursuant to familial abuse statute has, as an essential element, the defendant's receipt of the lawful order, which the State must prove beyond a reasonable doubt); State v. King, 139 Hawaiʻi 249, 257, 386 P.3d 886, 894 (2016) (interpreting the "'lawful order' element" of the offense of second-degree burglary under HRS § 708-811 (2014), determining that no probable cause existed to support this element of the charge, and affirming the lower court's dismissal of the case); see also 75 Am. Jur. 2d Trespass § 191 (2013) (observing in context of statutory elements of criminal trespass that "[w]hen property is open to the public at the time of an alleged criminal trespass, the state has the burden of proving that a lawful order excluding the defendant from the premises [was] issued").

[12] We also note that Officer Lawson's testimony at the motion to dismiss proceeding regarding MPD's policy on media contact suggested a lack of a clear protocol on photographing and filming police officers in public.

afforded by the Hawai'i Constitution to be at least as expansive as those provided by the United States Constitution.  See Crosby v. State Dep't of Budget & Fin., 76 Hawai'i 332, 339 n.9, 876 P.2d 1300, 1307 n.9 (1994).  Indeed, we have considered that in some circumstances, "this court may find that the Hawai'i Constitution affords greater free speech protection than its federal counterpart."  Id.; Oahu Publ'ns Inc. v. Ahn, 133 Hawai'i 482, 494, 331 P.3d 460, 472 (2014).

Although the First Amendment does not explicitly protect the right to film or photograph matters of public interest, the United States Supreme Court "ha[s] long recognized that its protection does not end at the spoken or written word." Texas v. Johnson, 491 U.S. 397, 404 (1989); see also Oahu Publ'ns Inc., 133 Hawai'i at 494, 331 P.3d at 472 (stating that "the First Amendment is 'broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights'" (quoting Globe Newspaper Co. v. Superior Court for Norfolk Cty., 457 U.S. 596, 604 (1982))). The Court has likewise considered that news gathering may receive constitutional protection because "without some protection for seeking out the news, freedom of the press could be eviscerated."  Branzburg v. Hayes, 408 U.S. 665, 681 (1972);

24

see also Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978) ("There is an undoubted right to gather news 'from any source by means within the law'" (quoting Branzburg, 408 U.S. at 681-82)). This understanding of the First Amendment serves the core function of "prohibit[ing] government from limiting the stock of information from which members of the public may draw." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978). The constitutional safeguard extends beyond protection of the press, id.; the "First Amendment protects the public's right of access to information about their officials' public activities." Fields v. City of Philadelphia, 862 F.3d 353, 359 (3d Cir. 2017) (emphasis added).

Based on these principles, numerous jurisdictions have held that the First Amendment affords individuals the right to photograph and film police officers in public places. In Glik v. Cunniffe, for example, the First Circuit Court of Appeals held that "filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities," is protected by the First Amendment. 655 F.3d 78, 82 (1st Cir. 2011). The First Circuit explained that "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" Id. (quoting

25

Mills v. Alabama, 384 U.S. 214, 218 (1966)).  Promotion of the free discussion of government operations is particularly desirable in the context of law enforcement officials because it may "aid[] in the uncovering of abuses" and "have a salutary effect on the functioning of government more generally."  Id. at 82-83; see also Gentile v. State Bar of Nevada, 501 U.S. 1030, 1034-35 (1991) (observing that "dissemination of information relating to alleged governmental misconduct" lies "at the core of the First Amendment" (quoting Butterworth v. Smith, 494 U.S. 624, 632 (1990))).

Several other federal courts have likewise concluded that, in light of these considerations, individuals have a constitutionally-protected First Amendment right to photograph and film police officers in public.  See Turner v. Lieutenant Driver, 848 F.3d 678, 690 (5th Cir. 2017) ("We agree with every circuit that has ruled on this question: Each has concluded that the First Amendment protects the right to record the police."); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing a "First Amendment right . . . to photograph or videotape police conduct" because the amendment "protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest"); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First amendment right to film

26

matters of public interest" and "to gather news" in the context of police officer's alleged assault and battery against individual filming the police officers assigned to work a demonstration); ACLU of Illinois v. Alvarez, 679 F.3d 583, 595, 597-98 (7th Cir. 2012) (recognizing that the First Amendment protects "[a]udio and audiovisual recording" and "gathering news and information, particularly . . . about the affairs of government" in the context of civil liberties organization's plan to make audiovisual recordings of police officers and disseminate the recordings to the general public).

Recently, the Third Circuit Court of Appeals considered the right of bystanders to record police officers performing their official duties. Fields, 862 F.3d at 359. The Fields court noted that "to record what there is a right for the eye to see and the ear to hear . . . lays aside subjective impressions for objective facts." Id. Thus, "to record is to see and hear more accurately."[13] Id. In addition to the valuable benefit of recordings to facilitate discussion and be broadly distributed, the Third Circuit observed that

---

[13] Fields centered on whether there is a constitutional right to film police activity in a public place. We agree with the observation of the Fields court that a recording device serves to enhance the accuracy of observation that is protected in its own right. 862 F.3d at 359. This is to say that the right to record police is incidental to the broader right to access information on the activities of public officials, and where recording is constitutionally protected, observation without recording will generally be likewise protected.

> the proliferation of bystander videos has spurred action at all levels of government to address police misconduct and to protect civil rights. These videos have helped police departments identify and discipline problem officers. They have also assisted civil rights investigations and aided in the Department of Justice's work with local police departments. And just the act of recording, regardless what is recorded, may improve policing. . . . And of particular personal concern to police is that bystander recordings can exonerate an officer charged with wrongdoing.

Id. at 360 (internal citations and quotation marks omitted). The Fields court underscored that in order for the First Amendment's protection to have meaning, "the Amendment must also protect the act of creating that material." Id. at 358.

Courts that have held that the First Amendment protects the right to photograph and film police officers in public have also concluded that the right "is not without limitations." Glik, 655 F.3d at 84. Rather, the ability to film law enforcement officials in the course of performing their duties "may be subject to reasonable time, place, and manner restrictions." Id.; see also Turner, 848 F.3d at 690; Smith, 212 F.3d at 1333; Alvarez, 679 F.3d at 605. In Glik, the First Circuit determined that it need not address the specific parameters of what constituted a reasonable time, place, or manner regulation because the individual's "exercise of his First Amendment rights fell well within the bounds of the Constitution's protections." 655 F.3d at 84. This was so because (1) his filming occurred in a public park, (2) he video-recorded the police officers from a "comfortable remove" and

"'neither spoke to nor molested them in any way' (except in directly responding to the officers when they addressed him)," and (3) his recording was "peaceful" and "[did] not interfere with the police officers' performance of their duties."  Id. (quoting Iacobucci v. Boulter, 193 F.3d 14, 25 (1st Cir. 1999)).

In Gericke v. Begin, 753 F.3d 1, 7 (1st Cir. 2014), the First Circuit squarely addressed the issue of time, place, and manner restrictions that it left open in Glik.  The Gericke court first rejected an argument that its holding in Glik did not apply to the filming of a traffic stop, holding that "First Amendment principles apply equally to the filming of a traffic stop and the filming of an arrest in a public park."  753 F.3d at 7.  However, the court reiterated that this right could be limited by "reasonable" time, place, and manner restrictions "when the circumstances justify them."  Id. at 7-8.  The First Circuit then specified that a time, place, or manner regulation could be issued by law enforcement to an individual filming police performing their duties in public "only if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with [the officer's] duties."  Id. at 8.

We agree with the reasoning of the First Circuit and of other federal courts of appeal that have considered this issue.  The rights to free speech and press serve not only to

protect the individual's right to self-expression, but also to promote the vital goal of "affording the public access to discussion, debate, and the dissemination of information and ideas." Bellotti, 435 U.S. at 783. Exercising the constitutionally-protected rights to free speech and press plays a crucial role in "informing and educating the public, offering criticism, and providing a forum for discussion and debate." Id. at 781. This aspect of the First Amendment is all the more critical when the ideas and information sought to be disseminated pertain to government officials and law enforcement personnel, "who are granted substantial discretion that may be misused to deprive individuals of their liberties." Glik, 655 F.3d at 82; see also Gentile, 501 U.S. at 1034-35. Public access to such information serves to guarantee "public oversight of law enforcement" and "minimizes the possibility of abuse by ensuring that police departments and officers are held accountable for their actions." Peer News LLC v. City & Cty. of Honolulu, 138 Hawai'i 53, 73-74, 376 P.3d 1, 22-23 (2016) (considering accessibility of police officer disciplinary records under state public records law). In light of these principles, this court likewise concludes that the "filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities," Glik, 655 F.2d at 82, is protected by the First Amendment to the

United States Constitution and by the independent protections afforded by article I, section 4 of the Hawai'i Constitution.

We also agree that this right is subject to reasonable restrictions as to the time, place, and manner of the photography or recording.  See Glik, 655 F.2d at 84; Turner, 848 F.3d at 690; Smith, 212 F.3d at 1333; Alvarez, 679 F.3d at 605; Gericke, 753 F.3d at 7-8; Fields, 862 F.3d at 360.  Such restrictions may be necessary to ensure that law enforcement officials are capable of carrying out their duties and maintaining the safety of both the general public and of the individual conducting the photography or videography.  We are persuaded that the threshold requirement for the issuance of time, place, and manner restrictions as set forth by the First Circuit in Gericke strikes the appropriate balance between ensuring public safety, preserving law enforcement's efficacy, and protecting constitutional free speech and press rights.

Thus, we conclude that the constitutionally-guaranteed right to photograph or film the activities of police officers in public may be limited by time, place, and manner restrictions so long as a reasonable officer would conclude that the individual's action is interfering or about to interfere with

the officer's performance of his or her duties.[14]  See Gericke,

753 F.3d at 8; Fields, 862 F.3d at 360.  If issued, police

orders pertaining to the time, place, or manner of filming must

be narrowly tailored to mitigate the actual danger or risk posed

by the recording and leave open ample alternative channels to

engage in the protected activity, consistent with established

principles of First Amendment jurisprudence.[15]  See Turner, 848

F.3d at 690; Alvarez, 679 F.3d at 605, 607; see also State v.

Bloss, 64 Haw. 148, 160-61, 637 P.2d 1117, 1127-28 (1981)

(discussing permissibility of issuing time, place, and manner

restrictions on constitutionally-protected speech).

As a necessary corollary to the requirement that a

time, place, and manner restriction be narrowly tailored and

leave open ample alternative channels of photographing or video

recording, the restriction in this context must also be specific

and "clear[ly] and unambiguous[ly]" communicated by the officer.

---

[14]    An order that a reasonable officer would conclude is necessary to ensure the safety of all persons involved in a police stop--including the safety of the officer--would be a reasonable restriction so long as it satisfies other constitutional requirements.  In evaluating what safety precautions are necessary in the context of a stop conducted near moving traffic, the officer may consider the risks posed by those vehicles.

[15]    As an alternative to ad hoc orders that may give rise to claims of arbitrary enforcement, law enforcement or other government actors may establish a uniform policy of time, place, or manner restrictions that are narrowly tailored to prevent interference with legitimate police duties and leave open ample alternate channels for accessing accurate information on police activity.  See Gericke, 753 F.3d at 7 ("Such a restriction could take the form of a reasonable, contemporaneous order from a police officer, or a preexisting statute, ordinance, regulation, or other published restriction with a legitimate governmental purpose.").

32

See State v. Guyton, 135 Hawai'i 372, 377-78, 351 P.3d 1138, 1143-44 (2015) (quoting LeMay v. Leander, 92 Hawai'i 614, 625, 994 P.2d 546, 557 (2000)) (holding that a court injunction whose violation subjects a party to criminal penalties must state its terms clearly and unambiguously and "allow a person of ordinary intelligence" to understand what acts are prohibited). Thus, the order or direction must be sufficiently clear and specific so that ordinary individuals exercising their constitutional rights to free speech can readily identify the conduct that the order prohibits. See id. (observing that requirements of particularity and specificity are based in part on the concepts of "fairness and due process," which "dictate that a court order must be sufficiently particular and definite so as to clearly identify the conduct that it prohibits"). Clarity and specificity are all the more important in the context of the offense charged in this case, as under HRS § 291C-23, mere lack of compliance with a police officer's verbal "order or direction" renders conduct "unlawful" that otherwise may be lawful and constitutionally protected.

In this case, Russo was engaged in video recording Officers Lawson and Fairchild as they conducted a traffic stop pursuant to a scheduled law enforcement action. Whether he was

acting in an individual capacity or as a representative of the media,[16] Russo's conduct in videotaping the police officers in public was protected by the First Amendment to the United States Constitution and article I, section 4 of the Hawai'i Constitution.

Officers Lawson and Fairchild were entitled to issue directives to regulate the time, place, and manner of Russo's video recording so long as the officers possessed an objectively reasonable belief that Russo was interfering or about to interfere with the ongoing traffic stop. Assuming the officers so concluded, any orders or commands they delivered were required to be clear, specific, and narrowly tailored to mitigate the actual danger or risk posed by the recording, and the directives were required to leave open ample alternative channels to observe the officers' activities.

In light of our disposition of other issues, we do not determine whether the officers' order to Russo satisfied these requirements. Rather, we observe that "[i]n our society, police officers are expected to endure significant burdens caused by

---

[16] As the Glik court correctly observed, "[i]t is of no significance" whether the recording is conducted by "a private individual, and not a reporter, gathering information about public officials." 655 F.3d at 83. The constitutional rights to free speech and press do not "inure[] solely to the benefit of the news media; rather, the public's right of access to information is coextensive with that of the press." Id.; accord Fields, 862 F.3d at 359.

citizens' exercise of their First Amendment rights," and, to ensure the protections that the First Amendment affords, officers may often be expected to show restraint when "they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces."  Glik, 655 F.3d at 84.

### B. Russo's Compliance with the Officers' Order

Probable cause to support a charge is "established by 'a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'"  State v. Atwood, 129 Hawai'i 414, 419, 301 P.3d 1255, 1260 (2013) (quoting State v. Chung, 75 Haw. 398, 409-10, 862 P.2d 1063, 1070 (1993)).  Although the evidence need not be sufficient to support a conviction, see id., this court has concluded that the requirement of probable cause is at least as demanding as the preponderance of the evidence standard.  State v. Maganis, 109 Hawai'i 84, 86-88, 123 P.3d 679, 681-83 (2005) (rejecting ICA's interpretation of probable cause as requiring a lesser quantum of proof than the preponderance of the evidence standard as an "unreasonabl[e]" "attempt to 'water down'" the requirement).

In this case, the parties agree that "the best evidence is the video itself," and the parties stipulated the video into evidence.  In its oral ruling on Russo's motion to dismiss, the district court made findings based in large part on

the video footage of the events leading up to and including Russo's arrest.[17] The court determined that Russo was advised by MPD that "he was in the area of operations where cars were being pulled over" and that "he was in danger of being struck by a vehicle." The court then found that Russo was "instructed multiple times" by Officers Lawson and Fairchild to "step back out of the area of operation," but that Russo "did not comply with the instructions to step back and continued to engage the officers."[18]

The ICA majority concluded that these findings by the district court demonstrated that probable cause existed to support the charge against Russo for failure to comply with a lawful order of a police officer in violation of HRS § 291C-23. On certiorari to this court, Russo argues that the conclusions drawn by the ICA and the district court with respect to his compliance are inconsistent with the evidence because the video recording clearly and unequivocally shows that he complied with the officers' order to stand and/or step back.

---

[17] Because the parties agreed that the video was the best evidence of what actually occurred and "the trial court is in no better position to intelligently weigh the evidence than the appellate court," this court may review the video de novo. Fowler v. Weber, 607 N.W.2d 252, 254 (S.D. 2000) (applying de novo review to video evidence).

[18] In its COLs with respect to the charge of disorderly conduct, the district court likewise concluded that "Russo refused to comply with the lawful direction of police officers involved in Operation Recon to step out of the area of operations."

The video footage stipulated into evidence by the parties shows that Russo did, in fact, comply with the officers' order. When Officer Fairchild instructed Russo to return to his vehicle and turn on his hazard lights, Russo complied. When Officer Fairchild waved his hand and directed Russo to "step off to the side" to avoid getting "run over," Russo likewise complied--responding, "Okay," and walking away from the general area to which Officer Fairchild had gestured. When Russo was subsequently approached and ordered by Officer Lawson to "stand back there," Russo complied by taking a few steps away from the area and asking whether he could stand on private property. When Officer Lawson responded that he could not and ordered him to "stand back there," Russo took several steps back towards the highway and asked, "Can I stand on public property?" When Officer Lawson then threatened Russo with arrest, Russo immediately began walking backwards, away from the area and towards the general direction to which Officers Lawson and Fairchild pointed. For the remainder of the video, as the police officers persisted in walking towards Russo and commanding that he "stand back there," Russo continued to walk backwards and away from the traffic stop area. It appears from the video recording that Russo only stopped walking backwards when he was physically prevented from doing so and arrested by the officers.

Although Russo may have continued to engage Officers Lawson and Fairchild in conversation and questions during the encounter, the video itself plainly demonstrates that Russo obeyed their command. Russo appeared to make a concerted effort to comply with the officers' instructions, and the video shows that he walked away or backwards when ordered by the officers to step or stand back.[19] The parties agreed that the video footage was the best evidence of the encounter, and the footage impels the conclusion that Russo did, in fact, comply with the officers' order. Thus, given the evidence in this case, there was no probable cause to support the charge of failure to comply with a lawful order of a police officer in violation of HRS § 291C-23. The facts and circumstances as adduced by the parties at the motion to dismiss hearing would not cause a reasonable person "to believe and conscientiously entertain a strong suspicion," Atwood, 129 Hawaiʻi at 419, 301 P.3d at 1260 (quoting Chung, 75 Haw. at 409-10, 862 P.2d at 1070), that Russo was willfully failing or refusing to comply with any lawful order issued by Officers Lawson and Fairchild. Rather, as stated, the

---

[19] We observe that the need for the officers to repeat the order to "stand back there" may have stemmed from a lack of specificity and clarity regarding where Russo could, in fact, stand. As stated, the "order or direction" alleged to have been violated must be clearly and unambiguously communicated so that an ordinary individual can identify the conduct that it prohibits. See State v. Guyton, 135 Hawaiʻi 372, 377-78, 351 P.3d 1138, 1143-44 (2015).

video evidence shows that Russo was complying with the officers' order.[20] Thus, the ICA erred in concluding otherwise.[21]

## IV. CONCLUSION

Although the district court incorrectly concluded that HRS § 291C-23 did not apply to Russo's conduct and dismissed the failure to comply charge on that basis, this court may affirm a judgment of the lower court on any ground in the record that supports affirmance, even if that ground was not expressly relied upon by the lower court. State v. Fukagawa, 100 Hawai'i 498, 506-07, 60 P.3d 899, 907-08 (2002). Here, an alternative basis for dismissing the charge applies--namely, that probable cause was lacking as to the charge of failure to comply with a lawful order of a police officer pursuant to HRS § 291C-23. Although the ICA correctly concluded that the district court erred in its interpretation of the statute, the ICA erred to the extent that it vacated the district court's dismissal order and remanded for further proceedings after determining that probable cause existed to support a charge against Russo under HRS §

---

[20] As noted above, because the video footage demonstrates that Russo complied with the order given by Officers Lawson and Fairchild, we need not address whether the order was "lawful"--that is, whether the order was narrowly tailored, left open ample alternative channels to engage in the constitutionally-protected activity, and was clearly conveyed using specific and unambiguous terms.

[21] To the extent that the district court's findings and conclusions are contrary to the video footage's clear depiction of Russo's compliance with the officers' order, they are clearly erroneous.

291C-23.  Accordingly, we vacate the ICA's May 1, 2017 Judgment on Appeal and affirm the district court's July 9, 2014 Notice of Entry of Judgment And/Or Order dismissing charges against Russo with prejudice for lack of probable cause.

| | |
|---|---|
| Jacob K. Lowenthal,<br>Benjamin E. Lowenthal, and<br>Samuel G. MacRoberts<br>for petitioner | /s/ Mark E. Recktenwald<br><br>/s/ Paula A. Nakayama<br><br>/s/ Sabrina S. McKenna |
| Richard K. Minatoya<br>for respondent | /s/ Richard W. Pollack<br><br>/s/ Michael D. Wilson |

